Argued and submitted August 8, reversed and remanded December 6, 2006

# Lynn LOVE,
*Appellant,*

*v.*

# POLK COUNTY FIRE DISTRICT,
*Respondent.*

## 03P1524; A129097

149 P3d 199

Kevin T. Lafky argued the cause for appellant. With him on the briefs was Larry L. Linder.

Cecil Reniche-Smith argued the cause for respondent. With her on the briefs were Janet M. Schroer and Hoffman, Hart & Wagner, LLP.

Before Haselton, Presiding Judge, and Armstrong, Judge, and Maurer, Judge pro tempore.

HASELTON, P. J.

## HASELTON, P. J.

Plaintiff appeals, assigning error to the allowance of summary judgment in favor of defendant Polk County Fire District, on plaintiff's common-law claim for wrongful discharge. Plaintiff contends that she adduced evidence raising a genuine issue of material fact, ORCP 47 C, as to whether defendant terminated her employment because she had fulfilled one or more "important public dut[ies]." *Babick v. Oregon Arena Corp.*, 333 Or 401, 407, 40 P3d 1059 (2002). Defendant cross-assigns error to the trial court's denial of its motion to strike material from plaintiff's evidentiary submissions proffered in opposition to summary judgment. As explained below, we conclude that, even without consideration of the materials that are the subject of the cross-assignment of error, plaintiff presented evidence raising a triable issue as to at least one of her allegations, *viz.*, that she was discharged for raising concerns about a possible "cover-up" in response to an investigation of defendant's operations by the National Institute for Occupational Safety and Health (NIOSH)[1] following a fatal accident. Accordingly, we reverse and remand.

■ Summary judgment is proper if the "pleadings, depositions, affidavits, declarations and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." ORCP 47 C. "No genuine issue as to a material fact exists if, based upon the record before the court viewed in a manner most favorable to the adverse party, no objectively reasonable juror could return a verdict for the adverse party on the matter that is the subject of the motion for summary judgment." *Id.* In reviewing the allowance of summary judgment, we draw all reasonable inferences in favor of plaintiff, who was the nonmoving party. *West v. Allied Signal, Inc.*, 200 Or App 182, 187, 113 P3d 983 (2005).

We describe the material facts consistently with that standard of review.[2] Defendant is a public entity responsible

---

[1] NIOSH is a federal institute with authority to investigate and research workplace safety. *See* 29 USC § 671; 42 CFR Part 85a.

[2] To the extent that our description pertains to material that is the subject of defendant's cross-assignment of error, we address the proper relationship between

for overseeing the activities of a variety of both paid and volunteer fire service personnel. Plaintiff began working as a financial secretary for defendant in November 1996. Plaintiff's duties included providing accounting, financial management, and secretarial services for defendant's board of directors, as well as data entry of training records. With respect to data entry, plaintiff was responsible for recording what training courses fire service personnel attended; however, plaintiff was not responsible for monitoring individual compliance with applicable safety training standards.

Mark Prince became chief of the fire district sometime after plaintiff's employment began. Plaintiff disagreed with several aspects of Prince's leadership within the district. For example, when Prince arrived, an internal policy required fire service personnel to attend at least 75 percent of the training meetings offered by the district. Plaintiff, in performing her data entry responsibilities, noticed that many of the firefighters were not meeting that requirement. Plaintiff believed that the level of training attendance made the fire district less safe. However, by her own admission, plaintiff did not know what the state-mandated training attendance standards were, whether any even existed, or whether, at the current level of attendance, the firefighters were still meeting any applicable standards.

Subsequently, sometime during Prince's first year as chief, he lowered the training attendance policy to 50 percent. Again, because plaintiff had no knowledge of any state-mandated training attendance standard, she did not know whether that change rendered the district or any individual out of compliance with any such state standard. However, plaintiff believed that lowering the standard to 50 percent was yet another example of Prince's poor management and that the change adversely affected safety within the district.

the cross-assignment and our analysis and ultimate disposition below. *See* 209 Or App at 493 n 15, 494 n 17. For now, it suffices to state that (1) for several of plaintiff's "important public duty" allegations, the cross-assignment is immaterial because, even if the disputed material were considered, plaintiff failed to raise a genuine issue of material fact; and (2) with respect to the NIOSH "cover-up"-related allegations, even if the disputed material is not considered, plaintiff has raised a genuine issue of material fact.

Beyond her dissatisfaction with the training attendance policy, plaintiff also believed that the quality of training offered through the district was inadequate to maintain safety. Specifically, she believed that the members of the committee in charge of training the fire service personnel were not qualified for that responsibility.

Plaintiff expressed her concerns to many people within the fire district. She regularly spoke to her coworkers about her concerns, and many of them shared her views. On several occasions, plaintiff expressed generalized concerns about training attendance to Prince and his deputy chief, Patterson. As plaintiff explained:

"I would give [the training] reports to Patterson and Prince and point out that the people were not meeting the current policy.

"* * * * *

"I would just give it to them and—and point out to them that, you know, 'These are the percentages, these are the people not meeting it,' and I color highlighted it and just—I gave it—to them, but we didn't sit down and have a big discussion about it."

Prince confirmed that plaintiff told him of her concerns "that a number of the individuals weren't making the [75 percent] training requirements."

Plaintiff's concerns increased in March 2003, when three firefighters from the district were involved in an accident during a training exercise. The details of that accident are not clear from the summary judgment record. However, the record shows that the accident occurred during driver training and that one of the passengers in the vehicle died in the accident.

The fire district conducted an internal investigation of the accident. In addition, NIOSH made arrangements to conduct its own investigation. During that time, plaintiff heard speculation from coworkers that Prince and Patterson were planning to hide information from the NIOSH investigators. Plaintiff, at that time, had not seen any evidence indicating such a "cover-up," but she became increasingly concerned that the speculation was true.

As part of the NIOSH investigation, Prince assigned plaintiff to gather training records and other potentially relevant information. Consequently, plaintiff went to the fire marshal, Cane, to collect the district's standard operating procedures (SOPs). Cane was subordinate to Prince and Patterson, but superior to plaintiff. As fire marshal, Cane's duties primarily involved fire prevention and inspections. However, his "[p]eripheral duties include[d] * * * basic management of the District in [the] absence of the Chief or the Deputy Chief[.]" When plaintiff asked for the SOPs, Cane, in plaintiff's words, "explained to me that he was creating them after the fact."[3] That statement heightened plaintiff's suspicion of a cover-up because she understood Cane to mean that he was "backdating" the SOPs so as to hide prior deficiencies from the NIOSH investigators.[4]

Plaintiff immediately confronted Cane about the perceived "backdating." She was concerned that Cane's conduct was obstructing the NIOSH investigation, and she

---

[3] Defendant argues, relying on the rule announced in *Henderson-Rubio v. May Dept. Stores*, 53 Or App 575, 632 P2d 1289 (1981), that plaintiff's quoted statement cannot create a material issue of fact because, in defendant's view, it contradicts plaintiff's prior deposition testimony. In her deposition, plaintiff testified that Cane had not specifically told her that "he was instructed to backdate [SOPs] so it would appear to outsiders they were in effect at the time of the accident." Plaintiff also admitted that she had no direct evidence that such a cover-up ever occurred. Further, plaintiff admitted that, on the face of the SOPs, it would appear that they were not "backdated." However, when asked, "[T]hat would suggest, if anything, that [defendant was] not trying to cover things up, wouldn't it?" plaintiff responded, "I don't know." In addition, throughout her deposition, plaintiff maintained that she "had a concern" prompted by the fact that "they were doing—driving SOPs after the fact."

Defendant's invocation of *Henderson-Rubio* is unavailing because that principle applies only to statements in affidavits that are "clearly inconsistent" with prior deposition testimony. *Id.* at 585 n 6. In fact, *Henderson-Rubio* is limited to "contradictions of the 'x' versus 'not x' sort." *Knepper v. Brown*, 182 Or App 597, 616, 50 P3d 1209 (2002). Here, the statements in plaintiff's affidavit did not meet that standard.

[4] There is a significant dispute over the accuracy of plaintiff's account. Cane denied having made such a statement. Instead, according to Cane, he explained to plaintiff that

"the district has had a safety book given to the district by our insurance carrier that explains issues regarding driver safety and that the district has always had access to this information. However, I was taking this information and formally putting the information into a [SOP] format and that I would be passing this information onto [*sic*] NIOSH."

expressed that concern to him. In addition to her conversation with Cane, plaintiff discussed her concern with her coworkers. On at least one occasion, plaintiff told a coworker that the district "was going to hide the lack of training [from NIOSH] and pretend that there wasn't a problem."

Prince learned of plaintiff's encounter with Cane and of her conversations with her coworkers. He believed that plaintiff's conduct was unprofessional and distracting to the district's work. On May 31, 2003, the same day the NIOSH investigators were scheduled to arrive, Prince terminated plaintiff's employment with defendant. According to Prince, his decision to discharge plaintiff was based, at least in part, on plaintiff's suggestions to Cane and coworkers that the district was involved in a cover-up in response to the NIOSH investigation:

> "[T]here [was] * * * the questioning that she was bringing forth to [Cane] in regards to us trying to cover things up in the NIOSH investigation, that coming from a person that you rely on on a daily basis and you hold in a confidential capacity is not typically what is expected * * * by myself or any other Chief in the business."

In discharging plaintiff, Prince was also motivated by plaintiff's discussions regarding the perceived training deficiencies.

Plaintiff subsequently filed this action against defendant for common-law wrongful discharge. Specifically, plaintiff alleged that she had been discharged because she had "expressed concerns about whether or not the fire fighters were receiving proper training" and because she had questioned "why [defendant] was creating [SOPs] for driving to present to NIOSH for their investigation when they did not exist at the time of the [March 2003] accident." Plaintiff further alleged:

> "Questioning the adequacy of safety and whether it meets minimal requirements fulfills an important social policy. Questioning why Defendant was creating SOP's [sic] for driving to present to NIOSH that did not exist at the time of the accident fulfills an important social policy. It

protects both the public as a whole and fire fighters in particular. The discharge of Plaintiff thwarts these social policies and is a violation of the social policies."

Defendant moved for summary judgment. In so moving, defendant contended:

"[*T*]*rue* whistleblowing—the exposure of evidence of illegal or wrongful activities by one's employer or fellow employees * * * may indeed implicate [a wrongful discharge claim], but that is not what occurred in this case. * * * [P]laintiff had no evidence of any wrongdoing by Prince, Patterson or anyone else in the Fire District. * * * [P]laintiff's own concerns about training requirements and inadequacies were not founded on actual knowledge of what the training requirements, either the department's, the State's or the industry's, were. Plaintiff was simply *personally* dissatisfied with the requirements, and discussed that dissatisfaction with fellow workers, even though she had no evidentiary ground for her dissatisfaction."

(Emphasis in original.) In response, plaintiff contended that, regardless of the substantive merits of her concerns—that is, regardless of whether she was correct in her assessment of training deficiencies or an alleged cover-up during the NIOSH investigations—her complaints were made in good faith based on the information that she had. Further, according to plaintiff, making her concerns known fulfilled a "public duty," and, thus, defendant could not terminate her for expressing those concerns. After plaintiff responded to defendant's motion for summary judgment, defendant moved to strike portions of plaintiff's supporting affidavits as inadmissible hearsay.

The trial court, although denying defendant's motion to strike, granted summary judgment, explaining:

"[Plaintiff] does not claim that in 2003 she was aware of any state or industry training standards that were being violated by [defendant]. Even now, two years later, she does not direct the court to any statutory or regulatory violation inherent in [defendant's] * * * practices. It was her opinion that the training was inadequate. That opinion was bolstered and corroborated by [her coworkers] who held similar views, but at its core the dispute did not involve a question of lawful vs. unlawful conduct. It was a question of

differing philosophies about how a fire department should be run.

"* * * * *

"This would be a different case if [plaintiff] had gone to NIOSH, OSHA, the District Attorney, the Medical Examiner or some other person or entity with investigatory responsibility in the matter. * * * But the most that plaintiff can claim from this record is that she was fired for complaining to other staff members about Prince's and Patterson's management decisions."

Plaintiff appeals, reiterating her arguments to the trial court. For the reasons that follow, we conclude that, although plaintiff failed to adduce evidence raising genuine issues of material fact as to many of her "important public duty" allegations, there are triable issues of material fact pertaining to, at least, her NIOSH "cover-up"-related allegations. If plaintiff's evidence pertaining to that matter is credited, she made a legally sufficient showing that discharging her based, in part, on her expression of concerns about a cover-up in response to the NIOSH investigations was wrongful under the "important public duty" principle. Accordingly, we reverse and remand.

In *Babick*, the Supreme Court summarized the applicable general principles:

"Although this court repeatedly has affirmed the general validity of the at-will employment rule, it has acknowledged that a discharge of an at-will employee nonetheless may be deemed 'wrongful' (and, therefore, actionable) under certain circumstances. Examples of such circumstances include: (1) when the discharge is for exercising a job-related right that reflects an important public policy, *see, e.g., Brown v. Transcon Lines*, 284 Or 597, 588 P2d 1087 (1978) (employee unlawfully discharged for filing workers' compensation claim); or (2) when the discharge is for fulfilling some important public duty, *see, e.g., Delaney v. Taco Time Int'l*, 297 Or 10, 681 P2d 114 (1984) (employee discharged for refusing to defame another employee); *Nees v. Hocks*, 272 Or 210, 536 P2d 512 (1975) (employee discharged for serving on jury)."[5]

---

[5] It is a "well-settled principle that wrongful termination serves as 'an interstitial tort, designed to fill a remedial gap where a discharge in violation of public

333 Or at 407 (footnote omitted).

■     Here, plaintiff's wrongful discharge claim is prem-ised on the second, "important public duty" exception.[6] In determining whether plaintiff's employment was terminated for fulfilling an "important public duty," "[t]his court cannot create a public duty but must find one in constitutional or statutory provisions or case law." *Eusterman v. Northwest Permanente, P.C.*, 204 Or App 224, 229-30, 129 P3d 213, *rev den*, 341 Or 579 (2006). The provisions or cases relied on "cannot merely express a general public policy; rather, they must encourage specific acts or 'otherwise demonstrat[e] that such acts enjoy high social value.'" *Id.* at 230 (quoting *Babick*, 333 Or at 409) (brackets in *Eusterman*).

Before addressing the particulars of the parties' dis-pute, we must explore two subsidiary matters pertaining to the scope and proper application of the "important public duty" exception. First, what are the standards for identifying such a "duty"—that is, when is an employee's conduct of such a quality as to warrant protection in tort law? Second, how does the "important public duty" exception apply in "whistle-blower" situations?[7]

*Anderson v. Evergreen International Airlines, Inc.*, 131 Or App 726, 886 P2d 1068 (1994), *rev den*, 320 Or 749 (1995), *Banaitis v. Mitsubishi Bank, Ltd.*, 129 Or App 371,

policy would be left unvindicated.'" *Olsen v. Deschutes County*, 204 Or App 7, 14, 127 P3d 655, *rev den*, 341 Or 80 (2006) (quoting *Dunwoody v. Handskill Corp.*, 185 Or App 605, 612, 60 P3d 1135 (2003)). Consequently, the common-law tort of wrongful discharge is available only in the absence of an adequate alternative rem-edy. *Id.* We note further, and parenthetically—the parties have not argued the point—that plaintiff's claim is not superseded by the existence of ORS 659A.203, which provides a statutory cause of action to public employee "whistleblowers." *See Olsen*, 204 Or App at 13-17.

[6] On appeal, plaintiff, for the first time, asserts that she also satisfies the first, "job-related right," species of wrongful discharge. Plaintiff's argument in that regard was not preserved and differs qualitatively from her position before the trial court. Accordingly, we will not address it. *See State ex rel Juv. Dept. v. Pfaff*, 164 Or App 470, 480 n 6, 994 P2d 147 (1999), *rev den*, 331 Or 193 (2000) ("[A]lthough it is axiomatic that we may affirm on grounds not argued to the trial court, there is no authority for the proposition that, without invoking 'plain error,' we can *reverse* the trial court on grounds not argued to it." (Emphasis in original.)).

[7] ORS 659A.203 provides a statutory cause of action for public employee whis-tleblowers who suffer from retaliation. However, that statute is not the ground for plaintiff's claim in this case, nor was it, or any of its private employment analogs, the basis for any of the claims in the cases described below.

879 P2d 1288 (1994), *rev dismissed*, 321 Or 511 (1995), and the Supreme Court's opinion in *Babick* address the identification of an "important public duty." In *Anderson*, we held that such a duty existed where the plaintiff refused to violate applicable federal regulations. There, the defendant, an airline subject to regulation by the United States Federal Aviation Administration (FAA), discharged the plaintiff, one of its aircraft maintenance engineers, because of his refusal to violate a number of FAA regulations. For example, the employee refused to install defective parts in aircraft and further refused to make false safety certifications to the FAA. 131 Or App at 728. We held that, because the plaintiff was discharged for "refusing to violate FAA safety regulations," he was discharged for fulfilling a public duty. *Id.* at 734.

In contrast, in *Banaitis*, a bank employee refused to divulge clients' financial information to another bank. He refused to do so, despite the requests of his superiors, because he believed it would be "against bank policy, against the law and unethical." 129 Or App at 374. He was subsequently terminated for his refusal. In "finding" a public duty in that case, we relied on numerous statutes and rules that reflect the "public interest in protecting the confidentiality of commercial financial records." *Id.* at 378. The defendant argued that the cited statutes and rules were insufficient to evince a public duty because, unlike the FAA regulations in *Anderson*, they did not "specifically appl[y]" to the conduct in which the plaintiff had refused to engage. *Id.* at 376. We rejected that argument, holding:

> "[I]t is not necessary that a statute specifically regulate the conduct that precipitated the discharge. We review statutes and other authorities for evidence of a substantial public policy that would * * * be 'thwarted' if an employer were allowed to discharge its employee without liability."

*Id.* at 380 (citing *Nees*, 272 Or at 219).

The Supreme Court's decision in *Babick* further defined the sources and contours of the "important public duty" exception. There, the defendant hired the plaintiffs, private security guards, to provide security at a concert. 333 Or at 404. The plaintiffs arrested, or attempted to arrest, concertgoers for violating various criminal statutes and were

subsequently discharged as a result. The plaintiffs asserted that enforcing the criminal laws was an "important public duty"; that they had been discharged for fulfilling that duty; and, thus, that the termination of their employment was wrongful. We agreed, *Babick v. Oregon Arena Corp.*, 160 Or App 140, 980 P2d 1147 (1999), and the Supreme Court reversed.[8]

In asserting that their conduct fulfilled an "important public duty," the plaintiffs in *Babick* relied on a variety of statutes, including provisions of the Oregon Criminal Code and statutes allowing forceful citizen arrests, which, according to the plaintiffs, demonstrate the high social value of "a safe and orderly community[.]" 333 Or at 408. The defendants, in response, asked the Supreme Court to repudiate our analysis in *Banaitis* and hold, instead, that an "important public duty" exists "only if some statute or other source of law imposes a specific legal obligation on the employee to act in the way that precipitat[ed] the discharge." 333 Or at 409.

The Supreme Court declined to repudiate *Banaitis*'s "formulation" in favor of the defendants' "antagonistic" and "far narrower" construct. 333 Or at 409. That was so because, even under *Banaitis*'s derivative approach,

"the statutes on which [the] plaintiffs rely do not establish any public duty that is relevant in this case.

---

[8] In concluding that the plaintiffs' conduct implicated the requisite duty, we observed:

"Oregonians value an orderly and safe community. The importance of maintaining that condition is reflected in laws criminalizing disruptive behavior and in laws giving private citizens the power to arrest. That public concern is heightened in large public gatherings, where the potential for social disorder is increased and where police officers might not necessarily be present. In those circumstances, Oregonians have shown a common concern for reliable protection by citizen officers and value the order that derives from such law enforcement functions. Thus, we hold that, because plaintiffs were discharged for taking steps to maintain order at a large, public event, plaintiffs' discharge thwarted the important public policy of preserving order at such an event, where social disorder might occur and where police officers might not be present or not be present in sufficient numbers to ensure public order on their own."

160 Or App at 146.

"* * * [The plaintiffs argue that the cited criminal statutes] reflect a public policy against crime, and in favor of community safety and order. However, such expressions of a public desire for law and order are far too general to support [the] plaintiffs' 'public duty' theory. We are concerned here with a duty to perform a specific act (the arrest of lawbreakers by private citizens or private security personnel), and the statutes cited have nothing to say about that kind of act."

333 Or at 409. The court went on to explain:

"[W]hether the allusion to common 'concern' [regarding law enforcement] is accurate, [the] statutes, on their face, are neutral on the essential issue, which is whether the law encourages law enforcement action by private individuals or security personnel or otherwise demonstrates that such acts enjoy high social value."

*Id.*

In combination, *Anderson*, *Banaitis*, and *Babick* establish that a public duty may be "found" through cases, statutes, rules, or constitutional provisions that either (1) specifically encourage or require a particular action or (2) " 'otherwise demonstrat[e] that such act[ion] enjoy[s] high social value.' " *See Eusterman*, 204 Or App at 230 (so stating) (brackets in original). The first category is—at least—relatively objective, but the second is, seemingly, more impressionistic. As noted, in *Banaitis*, we held that the social value of protecting confidential financial information for commercial enterprises was of sufficient importance that a bank employee had a duty not to violate that confidentiality. The quality and magnitude of that social value was manifested in various statutes prohibiting, and even criminalizing, misappropriation of such information in various circumstances. Conversely, however, in *Babick*—despite the fact that the Oregon Criminal Code prohibited the acts for which the concertgoers were arrested, and despite the fact that citizens are *permitted* to make forceful arrests for such crimes—the Supreme Court concluded that the plaintiffs, in arresting law breakers, had not fulfilled an "important social duty."

In *Babick*'s wake, we must conclude that, for purposes of wrongful discharge, the class of conduct that is

deemed to "enjoy high social value" is very narrowly circumscribed. Nevertheless, that class consists *at least* of (1) conduct that, by statute or rule, is explicitly described as being of high social value; and (2) conduct that is similar to that giving rise to legally compelled obligations to act in other, analogous contexts. However, it is also apparent from *Babick* that general public concern over a particular social problem (*e.g.*, the use of controlled substances in *Babick*) does not necessarily give rise to a protected "important public duty" to act, regardless of how ostensibly laudable the actor's efforts may be.[9]

The second subsidiary issue pertains to the application of the "important public duty" doctrine in "whistleblower" situations. In *Dalby v. Sisters of Providence*, 125 Or App 149, 865 P2d 391 (1993), the plaintiff, a pharmacy technician responsible for taking a monthly inventory of the pharmacy's drugs, was discharged for reporting, to her supervisor, record-keeping inaccuracies that violated applicable provisions of the Oregon Administrative Rules. Likewise, in *Hirsovescu v. Shangri-La Corp.*, 113 Or App 145, 831 P2d 73 (1992), the plaintiff, a maintenance worker in a residential care facility, was discharged because "he disclosed information about dangerous conditions and potential physical abuse of residents to a representative of the Oregon Mental Health and Developmental Disability Services Division[.]" *Id.* at 148-49. In each case, we held that the plaintiffs' allegations, if proved, established wrongful discharge for fulfilling an "important public duty."

Those cases are significant to this dispute because they recognize the existence of an important public duty to "blow the whistle" on certain behavior even in the absence of a specific statutory obligation to do so. That is, exposing certain statutory or regulatory violations, including health and safety violations, is sufficiently "important" that, under certain conditions, an employee who does so is protected from being discharged for that conduct.

---

[9] We need not determine here what other conduct, following *Babick*, has sufficient "high social value." Query, however: Would an employee who is fired for tardiness caused by her efforts to save a drowning child have a cause of action for wrongful discharge? Would the same be true if one of the security officers in *Babick* had prevented a murder or sexual assault?

The parties have vigorously disputed one of those conditions, *viz.*, whether the "whistleblowing" employee need act only with subjective "good faith" that the employer has violated the law, or whether, regardless of the employee's good faith belief, he or she must also have an objectively reasonable basis for that belief. Plaintiff espouses the former belief; defendant, the latter. *McQuary v. Bel Air Convalescent Home, Inc.*, 69 Or App 107, 684 P2d 21, *rev den*, 298 Or 37 (1984), is the striking point of that dispute.

In *McQuary*, the plaintiff, a training director at a licensed nursing home, was told by a patient that she had been abused by the facility's administrator. *Id.* at 109-10. The plaintiff confronted the administrator, who was her supervisor, about the abuse and threatened to report his conduct to the Health Division. The administrator terminated the plaintiff's employment and the plaintiff consequently filed a claim alleging wrongful discharge. At trial, the defendant requested, and received, a jury instruction that required the plaintiff to prove that "patient abuse" had, in fact, occurred.[10] *Id.* at 109. The jury returned a defense verdict and, on appeal, the plaintiff assigned error to that instruction, arguing that, as a matter of law, a "good faith" belief that the patient had been abused was all that was required.

We began by discussing whether the plaintiff had a "potential wrongful discharge claim." *Id.* at 111. That is, as a preliminary matter, we decided whether, in the abstract, reporting patient abuse is an "important public duty." We concluded that, because of the social interest in having health and safety violations exposed, the plaintiff had such a potential claim:

"The legislature's desire to protect patients * * * shows that that protection is an important public policy analogous to the performance of jury duty or the avoidance of defamation, policies which the Supreme Court has found to justify

___

[10] The requested jury instruction required the plaintiff to prove that "patient abuse" had actually occurred. We noted that the term "patient abuse" was being used in a "broad[ ], nonstatutory sense." *McQuary*, 69 Or App at 109 n 3. That is, the requested instruction did not require the plaintiff to prove, as a matter of law, that the administrator's conduct constituted "patient abuse" as that term is statutorily defined. *See id.* Instead, it required her to prove that the patient had actually been "abused" as the plaintiff had alleged.

wrongful discharge claims. * * * A discharge for reporting a violation of that policy to the proper authority would thus be a discharge for fulfilling a societal obligation and would be actionable."

*Id.* at 110 (citations omitted). Further, the discharge was actionable even though the plaintiff had only "threatened" to report the administrator's conduct. That was so because "[t]here is no reason that an employe's protection should depend on whether the employer acts before or after the employe is able to file a complaint." *Id.* at 111 n 5.

We turned, then, to the jury instruction and the "good faith" issue. We began by observing:

"We are required to choose between competing social values: Either [the] plaintiff must act at her peril in making a complaint, risking her job if the complaint later turns out to be unfounded, or the employer must act at its peril in firing her, risking damages if she turns out to have acted in good faith."[11]

*Id.* at 111.

In making that policy-predicated choice, we referred to several statutory provisions. Specifically, we cited a variety of "[s]tatutes which protect employes against retaliation [but] do not require that the alleged violation which the employe claims be ultimately proved." *Id.*; *see, e.g.*, ORS 652.355 (protecting employees who consult an attorney or agency about a wage claim); ORS 654.062(5) (protecting any employee who makes a complaint under the Oregon Safe Employment Act).[12] Further—and of particular relevance to

---

[11] With distant hindsight, and benefit of the present parties' arguments, the "choice" we posited in *McQuary* appears to have been incomplete. In *McQuary*, we framed the "choice" as a dichotomy: Either (1) the plaintiff's good faith was dispositive, regardless of whether the alleged conduct occasioning the "whistleblowing" had actually occurred or (2) the nonoccurrence of the alleged conduct was dispositive, regardless of the plaintiff's good faith. However, there is, at least, a third option—the one that defendant raises here: Regardless of the plaintiff's subjective good faith, and regardless of whether the alleged conduct in fact occurred, the dispositive consideration is whether there was an objectively reasonable basis for the plaintiff's belief that his or her employer had engaged in conduct that, if proved, violated applicable law.

[12] Those statutes could have been only analogously helpful to *McQuary*'s analysis of whether the plaintiff's conduct fulfilled an "important public duty," because they pertain to protections against retaliation for "exercising a job-related

this case—in concluding that "considerations of public policy" supported extending protection against discharge to "an employe who reports a violation of a nursing home patient's statutory rights in good faith[,]" we relied on *former* ORS 659.035(1), *renumbered as* ORS 659A.233(1) (2001). *Id.* at 112. That statute specifically protects an employee who reports *an incident of patient abuse* "in good faith."[13] Consequently, we concluded that the plaintiff's wrongful termination claim required her only to show that she believed in good faith that the incident of abuse occurred. *Id.* at 111-12.

Here, plaintiff, invoking *McQuary*, argues that her evidentiary submissions show that she acted in "good faith." That is, that notwithstanding her lack of knowledge of applicable safety standards—indeed, her inability to identify even a single standard—proof of her subjective good faith belief was sufficient to defeat summary judgment. Conversely, defendant contends that *McQuary* should not be understood, or applied, so broadly in this context. Rather, defendant contends, the proper inquiry is whether, at the time plaintiff expressed her "whistleblowing" complaints, she had an objectively reasonable basis for those complaints. Specifically, did plaintiff have an objectively reasonable belief that defendant had engaged in conduct, which, if proved, violated statutory or regulatory requirements? On this threshold question, we agree with defendant.

We do so because plaintiff's "whistleblowing"-based wrongful discharge allegations in this case arise in a materially, legally different context than the plaintiff's claims in *McQuary*. In *McQuary*, as noted, our assessment of "policy choices" was substantially informed by analogous reference

---

right that reflects an important public policy," *Babick*, 333 Or at 407, which is a separate and distinct species of wrongful discharge.

[13] Under *former* ORS 659.035, it was an unlawful employment practice for an employer to "discharge, demote, suspend or in any manner discriminate or retaliate against an employe" in the terms and conditions of the employee's employment "for the reason that the employe has in good faith reported possible violations of ORS chapter 441 * * *." ORS 441.605(7) declares that residents of long term care facilities have the right to be free from "mental and physical abuse."

ORS 659.035(1) was enacted in 1981, Or Laws 1981, ch 470, § 5, after the plaintiff's discharge in *McQuary* and before we issued our opinion. In referring to that statute, we observed, "[t]he legislature has decided the precise issue in this case for future terminations." 69 Or App at 112 n 6.

to the legislative determination in *former* ORS 659.035 to afford statutory protection to "good faith" whistleblowing reports of patient abuse by nursing home personnel. 69 Or App at 112. This case does not, of course, involve reports of patient abuse. Consequently, *former* ORS 659.035 (now ORS 659A.233) is inapposite in determining whether a good faith belief, even if objectively unreasonable, is sufficient to sustain the present common-law "whistleblower"-based wrongful discharge claim. Rather, in making that determination, we must turn to other sources of "policy" guidance. Those sources militate in favor of an "objectively reasonable" belief standard in this context.

We note, particularly, that plaintiff was a public employee—and, if she had alleged a statutory claim, it would have been governed by ORS 659A.203(1). That statute makes it an unlawful employment practice for a public employer to

"(b)   Prohibit any employee from disclosing, or take or threaten to take disciplinary action against an employee for the disclosure of any information that the employee *reasonably believes* is evidence of:

"(A)   A violation of any federal or state law, rule or regulation by the state, agency or political subdivision; [or]

"(B)   Mismanagement, gross waste of funds or abuse of authority or substantial and specific danger to public health and safety resulting from action of the state, agency or political subdivision[.]

"* * * * *

"(d)   Discourage, restrain, dissuade, coerce, prevent or otherwise interfere with disclosure or discussions described in this section."

(Emphasis added.) To be sure, plaintiff's claim is a common-law claim. Nevertheless, as in *McQuary*, the legislative choice with respect to the analogous statutory claim is instructive with respect to the conditions under which the exercise of the purported public duty should be afforded protection.

The contrast between *former* ORS 659.035(1) and ORS 659A.203(1) is striking. The former antedated the latter; the legislature knew how to specify a "good faith" threshold, but it did not do so. Rather, the content and design of ORS 659A.203(1) evince a conscious policy choice to strike a different balance, in this context, between the competing interests that we addressed in *McQuary*. That is, the legislature intended that the "threshold" for the generality of public employee whistleblower claims be different, and more demanding, than with respect to whistleblowing claims based on reports of patient abuse.

That legislative choice is instructive, not preclusive: In this common-law context, the definition of the cause of action is a judicial function. Nevertheless, the "important public duty" doctrine is innately intertwined with the legislative expression of policy choices in statutes. Here, the legislature has recognized the importance of "whistleblowing" by public employees—but only to a qualified extent. Confronted with competing considerations of (1) promoting freer and fuller disclosure by public employees and (2) avoiding the institutional and political consequences for public employers of good faith, but objectively baseless and irresponsible, "extramural" complaints by employees, the legislature has opted to extend statutory protection only to objectively reasonable complaints. Phrased somewhat differently: There is a protected "important public duty" for public employees to engage in *objectively reasonable* "whistleblowing." Plaintiff's common-law claim is properly subject to the same limitation.

We proceed to the application of those principles to this case. The gravamen of plaintiff's claim, as we understand it, is that she was discharged for expressing complaints about one or more of the following concerns: (1) the fire district's safety personnel failure to meet the 75 percent training attendance standard; (2) the overall deficient quality of fire safety training; and (3) her belief that Prince and Patterson were perpetrating a "cover-up," including fabricating and backdating crucial documentation, in response to the NIOSH investigation.[14] Plaintiff does not identify any case, statute,

---

[14] The summary judgment record and the parties' briefs indicate that plaintiff may have had other concerns as well, and that she may have made her concerns

rule, or constitutional provision that compelled any of her conduct. Rather, she asserts that, as in other "whistleblower" cases, by complaining about, and potentially exposing, her public employer's deficient, and even allegedly unlawful conduct, she was performing an "important public duty."

■    Plaintiff's allegations pertaining to the 75 percent training attendance dispute were properly subject to summary judgment because she failed to adduce any evidence showing that her complaints in that regard were objectively reasonable.[15] In particular, plaintiff failed to proffer evidence showing that, even assuming that the circumstances were as plaintiff believed them to be (*viz.*, that district personnel were not attending at least 75 percent of training sessions), those circumstances would constitute a violation of some applicable statute or rule. Rather, plaintiff admitted that she was completely unfamiliar with what, if any, training standards were in place on the state, federal, or industry level.[16] Further, plaintiff did not claim to have any knowledge of fire safety or of what specific dangers or risks may have been associated with the training attendance levels. Accordingly, regardless of plaintiff's good faith belief, her allegations in that regard fail for lack of proof that her complaints were based on an objectively reasonable belief.

Plaintiff's second generic class of complaints—*viz.*, that the training quality within the fire district was generally substandard—is similarly deficient. Again, in opposing summary judgment, plaintiff was unable to identify any statute or rule that would have been violated if defendant's training

---

known to various people inside and out of the fire district. However, the record does not contain evidence from which a reasonable factfinder could conclude that Prince or anyone else responsible for plaintiff's discharge was aware of those specific concerns or of plaintiff's complaints to others regarding them. As such, those complaints could not have formed the causal basis of plaintiff's discharge. *See Estes v. Lewis and Clark College*, 152 Or App 372, 381, 954 P2d 792, *rev den*, 327 Or 583 (1998) ("To succeed * * * the employee must establish a 'causal connection' between a protected activity and the discharge.").

[15] Certain portions of defendant's cross-assignment of error pertain to evidence potentially relevant to the first two classes of plaintiff's complaints. We do not resolve those portions of the cross-assignment of error because we conclude that, even if we were to affirm the trial court's denial of defendant's motion to strike, plaintiff's claim regarding those complaints cannot survive summary judgment.

[16] The record on summary judgment shows that the 75 percent attendance was an internal policy, set by defendant itself, and not mandated by statute or rule.

practices were, in fact, as she believed them to be. Without some grounding in an applicable statute or rule, plaintiff's complaints based on "holistic" safety concerns were not objectively reasonable and cannot be deemed to have furthered some important public duty.

■ Finally, we address plaintiff's complaints that her superiors were perpetrating a "cover-up" obstructing the NIOSH investigation. For the reasons that follow, we conclude that the trial court erred in allowing summary judgment with regard to those allegations.[17]

We begin by observing that the public interest advanced by "whistleblowing" regarding a calculated obstruction of a NIOSH investigation is at least as substantial as that in other cases sustaining "whistleblowing"-based wrongful discharge claims. NIOSH is part of the Department of Health, Education, and Welfare. 29 USC § 671. In creating NIOSH, Congress declared that the purpose of NIOSH and other investigatory institutes was to reduce the "substantial burden" caused by workplace injury. 29 USC § 651(a). NIOSH has broad investigatory powers, which include the authority to "to review, abstract, and duplicate such personnel records as are pertinent to mortality, morbidity, injury, safety, and other similar studies; and to question and interview privately any employer, owner, operator, agency, or employee from the place of employment." 42 CFR Part 85a.5(d)(1).

Here, NIOSH was performing its essential statutory function, investigating the circumstances of a fatal workplace accident. The alleged backdating and "cover-up," if true, obstructed and subverted NIOSH's performance of that core public safety-related function. Consequently, the public interest implicated here is at least as "important" as that in *Dalby* (reporting pharmacy record-keeping inaccuracies),

---

[17] Again, certain portions of defendant's cross-assignment of error pertain to evidence potentially relevant to whether plaintiff's belief regarding the alleged "cover-up" was objectively reasonable. We do not resolve those portions of the cross-assignment of error because we conclude that, even if we were to reverse the trial court's denial of defendant's motion to strike, plaintiff's remaining submissions in the summary judgment record establish an issue of material fact. Specifically, we rely on plaintiff's affidavit recounting her conversation with Cane. That evidence is not addressed by defendant's cross-assignment of error.

*Hirsovescu* (reporting nursing home patient abuse), and *McQuary* (same).

Thus, the NIOSH "cover-up"-related allegations were not susceptible to summary judgment if plaintiff adduced evidence showing that (1) her belief that defendant was engaging in such a "cover-up" was objectively reasonable and (2) her discharge was causally related to her complaints about the "cover-up" to Cane and others. Plaintiff presented evidence sufficient to satisfy her *prima facie* burden as to each of those matters.

Viewed in the light most favorable to plaintiff, the summary judgment record discloses that plaintiff initially had vague and unsubstantiated concerns that Prince and Patterson might conceal information regarding defendant's training practices from NIOSH investigators; that, in fulfilling her work responsibility and attempting to obtain training-related information for the NIOSH investigation, plaintiff spoke with the fire marshal, Cane, who told her that he was "creating [standard operating procedures] after the fact" to be submitted to NIOSH; that she understood Cane to mean that he was "backdating" those documents; and that she expressed those concerns to Cane. Although Cane's remarks, as recounted by plaintiff, were reasonably susceptible to different constructions, a reasonable person could understand those remarks as an admission that defendant, in response to the NIOSH investigation, was fabricating backdated documentation regarding defendant's training practices. Further, Cane, as a member of defendant's management team, was an ostensibly reliable source. Accordingly, on this record, there is a genuine issue of material fact as to whether plaintiff's complaints, including to Cane himself, about defendant engaging in a NIOSH "cover-up" were based on an objectively reasonable belief.

With respect to causation, Prince admitted in his deposition that plaintiff's discharge was motivated, at least in part, by plaintiff's "questioning that she was bringing forth * * * in regards to us trying to cover things up in the NIOSH investigation." That statement, coupled with the fact that plaintiff was put on administrative leave the same day that

the NIOSH investigators were to arrive, supports a reasonable inference that plaintiff's discharge was prompted by defendant's fear that she would voice her concerns to the investigators. In that regard, we appreciate that plaintiff never expressed her "backdating" concerns to NIOSH investigators or anyone else outside of defendant before her discharge. However, in *McQuary*, we recognized that threatening to report abuse was sufficient to support a wrongful discharge claim even though such a report was never actually made. *See* 69 Or App at 111 n 5. In so holding, we recognized that a discharge is wrongful when it stems from an effort by an employer to keep an employee from making a complaint to the proper authorities. Here, a finder of fact could reasonably infer that Prince acted, at least in part, from such a motivation.

In sum, there are genuine issues of material fact as to plaintiff's allegations that she was discharged for threatened "whistleblowing" about defendant's alleged conduct in response to the NIOSH investigation. Consequently, the trial court erred in allowing summary judgment against plaintiff's common-law claim for wrongful discharge.

Reversed and remanded.