Argued and submitted July 17, 2012, affirmed February 26, 2014

Wade NKRUMAH,
*Plaintiff-Appellant,*

*v.*

CITY OF PORTLAND,
*Defendant-Respondent.*

Multnomah County Circuit Court
090709873; A147057

323 P3d 453

Michael G. Hanlon argued the cause and filed the briefs for appellant.

Dennis M. Vannier argued the cause and filed the brief for respondent.

Before Armstrong, Presiding Judge, and Duncan, Judge, and Brewer, Judge pro tempore.

ARMSTRONG, P. J.

**ARMSTRONG, P. J.**

This case arises out of plaintiff's claims for wrongful discharge and unpaid wages relating to his employment as communications director for former Portland Mayor Sam Adams. Plaintiff appeals a judgment of dismissal entered by the trial court after the court granted defendant's motions for summary judgment on those claims. He argues that the court erred in granting summary judgment because triable issues of fact exist with regard to both claims. We affirm.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

Reviewing the record in the light most favorable to plaintiff—the nonmoving party—and drawing all reasonable inferences in his favor, *Jones v. General Motors Corp.*, 325 Or 404, 408, 939 P2d 608 (1997), the facts pertinent to our review are as follows.

Plaintiff was hired by defendant City of Portland to work as communications director for then mayor-elect Sam Adams. At the time, Adams was on the Portland City Council and was scheduled to take office as mayor on January 1, 2009. Adams had instructed Tom Miller, his chief of staff, to oversee the hiring process for his future mayoral staff, and Miller had the authority to hire staff to begin work upon Adams's assumption of office on January 1, 2009.

Plaintiff interviewed for the communications director position in October 2008. At the time, plaintiff had been employed as a reporter for the *Oregonian* for approximately 23 years but had accepted a "buyout"; his scheduled separation date from the *Oregonian* was November 8, 2008. During the interview process, Miller explained to plaintiff that the position would start in January 2009, when Adams took office as mayor. As plaintiff later testified, "[i]t was made clear when the position would start," and that he "would go on the payroll January 1st or, well, the 1st or the 2nd. The 1st was a holiday." Miller also told plaintiff that the offer was contingent on plaintiff working in November and December to "get[] a feel for the office and the job" and that plaintiff would not be paid for that time. Because of that arrangement, plaintiff terminated his employment with the *Oregonian* two weeks earlier than he had planned.

Plaintiff accepted the offer and began going to Adams's office on November 2, 2008. He was assigned an office in the Portland Building, introduced to people he would be working with, and attended staff meetings. He also helped with various projects but did not do any work communicating with the media. At Miller's direction, plaintiff also extended a previously scheduled family vacation to San Francisco in December and spent half a day observing San Francisco Mayor Gavin Newsom's communications staff's operations.

On January 2, 2009, plaintiff started working as Adams's communications director. He read and signed an employment agreement explaining that he was an "at-will" employee and confirming that his "First Day of Employment" was January 2, 2009. His job as communications director was to speak on the mayor's behalf; his written job description stated, "The Communications Director is responsible for all communications on the mayor's behalf, and manages the New Media Director."

Soon thereafter, in early January, allegations surfaced in the press that Adams had had a sexual relationship with Beau Breedlove, a legislative intern. Similar allegations had been raised in 2007 and denied by Adams. On January 15, 2009, a *Willamette Week* reporter interviewed Adams at City Hall. Plaintiff and another member of Adams's staff attended the interview. At that time, Adams again denied any sexual contact or sexual relationship with Breedlove. Four days later, however, Adams admitted to *Willamette Week* that he had had a sexual relationship with Breedlove. Adams then called plaintiff, and plaintiff prepared a news release about Adams's relationship with Breedlove and distributed it to the media. The following day, January 20, 2009, Adams held a press conference at City Hall in which he acknowledged having made false statements about his relationship with Breedlove and apologized to the public for having done that. He admitted to a sexual affair with Breedlove for about two months in 2005 and to having asked Breedlove to lie about the relationship.

That acknowledgment and apology generated intense media scrutiny. For three days, January 21 to 23, 2009,

Adams did not come into the office but remained at home trying to decide whether he should stay in office. He met with several members of his staff during that time, as well as members of the community, including former Portland Mayor Vera Katz and plaintiff's minister. During the three-day interval that Adams was out of the office, Miller asked plaintiff to tell the press

"that Sam was at home. He was at home conducting City business, meeting with people in the community."

Plaintiff did so. Plaintiff also received media requests for Adams's schedule during that time. Although the schedule existed, Miller told plaintiff to tell the media that it was "not available."

Sometime during that period, a reporter for the *Oregonian* also asked plaintiff about the public reaction that the mayor's office had been getting about the Breedlove matter; in response, plaintiff gave the reporter information that a staff member in Adams's office had compiled that indicated that "65 or something percent of the calls were a negative response to Sam." According to plaintiff, Miller "clearly was not happy" that plaintiff had given the reporter that information and later told the staff person to tell plaintiff in the future that such information did not exist or had not been compiled.

On January 22, Adams met with his staff at Miller's house. Adams apologized to the staff for his behavior and agreed to respond to any of their questions or concerns. Plaintiff asked Adams whether he had engaged in any "flirting or touching" with Breedlove when Breedlove was under 18 years of age. Adams said that he had not. Then, on January 25, 2009, plaintiff read an article in the *Oregonian* reporting an interview with Breedlove in which Breedlove had described two "kissing" incidents with Adams when Breedlove was 17 years old. After reading the article, plaintiff "determined that I could no longer tolerate a workplace where I was repeatedly given false or misleading information and then was expected to repeat these falsehoods to the public on the mayor's behalf as his spokesperson in response to media inquiries."

Plaintiff prepared a letter of resignation and submitted it to Miller the next morning. Late in the day, he also met with Adams, telling Adams that he was resigning "because of the lies." He specified that Adams had lied to him in the January 15, 2009, meeting with *Willamette Week*, when Adams had denied having had any sexual contact with Breedlove, and in the January 22, 2009, meeting when Adams had denied any flirting or touching when Breedlove was a minor. Adams asked plaintiff to reconsider his resignation and remain in his position. Plaintiff replied that he had made his decision and that there "was no turning back."

The day of plaintiff's resignation, in response to several inquiries by a *Time* magazine reporter about Adams's availability for an interview, Miller told plaintiff to tell the reporter that Adams was not in the office. However, unbeknownst to plaintiff, "Adams at various times throughout the day was present in City Hall."

Plaintiff subsequently filed this action, asserting claims for, among other things, wrongful discharge and unpaid wages.[1] With regard to his wrongful-discharge claim, plaintiff alleged the following, in part, in his second amended complaint:

"Adams' continued pattern of lying to both the public and [plaintiff] violated the public trust and made [plaintiff's] employment as the Mayor's communications director so intolerable that a reasonable person would have resigned.

"In view of plaintiff['s] *** reputation for truthfulness and Adams' persistent pattern of engaging in public misrepresentations, defendant *** knew that [plaintiff] was substantially certain to leave his employment as a result of working conditions in the Mayor's office in which making untrue statements to the public on Adams' behalf was required on a regular basis.

"The dissemination of truthful information to an informed electorate is one of the cornerstones of a democracy. [Plaintiff's] refusal to be a participant in Adams'

---

[1] Plaintiff also asserted claims for defamation and invasion of privacy. Plaintiff does not appeal the trial court's grant of summary judgment for defendant on those claims.

continued misrepresentations to the public fulfilled an important public duty and societal obligation to treat the Mayor's office as a public trust. Requiring ethical behavior by elected officials and ensuring the electorate receives communications free of false statements are compelling, high societal values that are expressly incorporated into the City's Code, state statutes, common law, and state and federal constitutional principles compelling public officials to deal honestly and truthfully with the public."

Plaintiff's claim for unpaid wages alleged that he was due wages under ORS 652.140 and ORS 652.150 for the period from November 2 to December 31, 2008, plus reasonable attorney fees and costs.[2]

After a period of discovery, the city filed motions for summary judgment on all claims. On plaintiff's wrongful-discharge claim, the city argued that the "undisputed facts will not support a claim for constructive termination," and, even if they did, plaintiff failed to demonstrate that his termination was in violation of an established public policy. Regarding the wage claim, the city argued that the undisputed evidence established that plaintiff was not entitled to wages for November and December 2008, because plaintiff had not become an employee of the city until January 2, 2009, and plaintiff "is not entitled to wages for the time he agreed to spend learning the ropes as a volunteer in Adams'[s] City Council office prior to his employment."

The trial court granted summary judgment for the city on each of plaintiff's claims. The court concluded that, even assuming that reasonable jurors could find that plaintiff was constructively discharged, under the relevant case law, particularly *Lamson v. Crater Lake Motors, Inc.*, 346 Or 628, 216 P3d 852 (2009), no reasonable juror could find that that discharge was wrongful under either exception to the rule of "at will" employment—*viz.*, that plaintiff had been constructively discharged for (1) "exercising a job-related right that reflects an important public policy (such as filing a workers' compensation claim)" or (2) "fulfilling an important public

---

[2] He also alleged that he was entitled to additional compensation under ORS 652.150 for late payment of his final wages for January 2009. The trial court ruled in favor of defendant on that issue, and plaintiff does not challenge that ruling on appeal.

duty (such as serving on a jury)." *Eustermann v. Northwest Permanente, P. C.*, 204 Or App 224, 299, 129 P3d 213, *rev den*, 341 Or 579 (2006). As the court noted, plaintiff conceded in the summary judgment hearing that he had quit his employment "because the mayor lied to him about his relationship with Beau Breedlove and other things, not because the mayor (or any other supervisor) ordered him to lie." The court explained,

"I thus agree that plaintiff would have a claim against the city *if* the mayor had fired him for refusing to lie to the public on the mayor's behalf, or for disclosing to the public truthful and important information that the mayor wanted to keep hidden. But, as noted above, that isn't what happened here. * * * *Plaintiff wasn't punished for exercising—or refusing to breach—the public duty that he identifies.*"

(Emphasis added.)

Regarding plaintiff's wage claim, the court concluded that, based on plaintiff's own deposition testimony, there was no dispute that plaintiff had "volunteered" his services to the city in November and December of 2008 and, therefore, under ORS 653.010,[3] plaintiff was not employed by the city during that period, and, consequently, he was not entitled to wages for that period. Accordingly, the city was entitled to judgment as a matter of law on that claim as well. The court subsequently entered a general judgment dismissing plaintiff's claims with prejudice, and this appeal followed.

## II.  ANALYSIS

On appeal, plaintiff generally reprises the arguments that he made to the trial court. We consider each claim in turn and conclude that the trial court correctly granted summary judgment for the city in both instances.

We may affirm a grant of summary judgment if, viewing the summary judgment record and taking all reasonable inferences in favor of the adverse party, we determine that there is no genuine issue of material fact and the

---

[3] ORS 653.010(2) excludes from the definition of "employ," for purposes of Oregon's minimum-wage law, "voluntary or donated services performed for no compensation or without expectation or contemplation of compensation as the adequate consideration for the services performed for a public employer."

moving party is entitled to judgment as a matter of law. ORCP 47 C; *Jones*, 325 Or 404. There is no genuine issue of material fact if, based on the record so viewed, "no objectively reasonable juror could return a verdict for the adverse party on the matter that is the subject of the motion for summary judgment." ORCP 47 C. "The adverse party has the burden of producing evidence on any issue raised in the motion as to which the adverse party would have the burden of persuasion at trial." *Id.*

A. *Wrongful Discharge*

Oregon generally follows the "at-will" employment rule, meaning that, absent a contractual, statutory, or constitutional requirement to the contrary, an employee may be terminated without notice and for any reason. *Washburn v. Columbia Forest Products, Inc.*, 340 Or 469, 475, 134 P3d 161 (2006). Notwithstanding that general rule, since *Nees v. Hocks*, 272 Or 210, 536 P2d 512 (1975), Oregon has recognized that the discharge of an at-will employee may be actionable under certain circumstances—*viz.*, "'circumstances in which an employer discharges an employee for such a socially undesirable motive that the employer must respond in damages for any injury done.'" *Lamson*, 346 Or at 635 (quoting *Nees*, 272 Or at 218). Examples of those circumstances include:

> "(1) when the discharge is for exercising a job-related right that reflects an important public policy, *see, e.g., Brown v. Transcon Lines*, 284 Or 597, 588 P2d 1087 (1978) (employee unlawfully discharged for filing workers' compensation claim); or (2) when the discharge is for fulfilling some important public duty, *see, e.g., Delaney v. Taco Time Int'l*, 297 Or 10, 681 P2d 114 (1984) (employee discharged for refusing to defame another employee); *Nees v. Hocks*, 272 Or 210, 536 P2d 512 (1975) (employee discharged for serving on jury)."

*Babick v. Oregon Arena Corp.*, 333 Or 401, 407, 40 P3d 1059 (2002).

Where, as in this case, the employee asserting a wrongful-discharge claim was not actually discharged, but quit his employment, the employee must also establish that he was "constructively discharged"—that is, that

the employer's "intentional conduct made his employment so intolerable that a reasonable person in plaintiff's position would have resigned." *Handam v. Wilsonville Holiday Partners, LLC*, 225 Or App 442, 447, 201 P3d 920 (2009), *vac'd and rem'd*, 347 Or 533, 225 P3d 43, *adh'd to on remand*, 235 Or App 688, 234 P3d 133, *rev den*, 349 Or 171 (2010) (citing *McGanty v. Staudenraus*, 321 Or 532, 557, 901 P2d 841 (1995)). As the Supreme Court reiterated in *McGanty*, "[t]o allege a claim of wrongful discharge, there must be a *discharge*, and that discharge must be 'wrongful.'" 321 Or at 551 (emphasis added; some internal quotation marks omitted).

> "[T]o establish a constructive discharge, a plaintiff must allege and prove that (1) the employer intentionally created or intentionally maintained specified working conditions; *(2) those working conditions were so intolerable that a reasonable person in the employee's position would have resigned because of them;* (3) the employer desired to cause the employee to leave employment as a result of those working conditions *or* knew that the employee was certain or substantially certain, to leave employment as a result of those working conditions; and (4) the employee did leave the employment as a result of those working conditions."

*Id.* at 557 (first emphasis added; second emphasis in original; footnotes omitted). As the Supreme Court explained in *McGanty*, the second requirement embodies an objective test, requiring that

> "an objective inquiry * * * be made to determine whether working conditions imposed by an employer are so intolerable as to force a resignation.

> "An objective test preserves the requirement that there be a discharge, before there can be a wrongful discharge. If an employee chooses to quit because of objectively *tolerable* working conditions, it cannot fairly be said that the employer has induced the employee to resign rather than be fired. Objectively tolerable working conditions simply are not an inducement to resign."

*Id.* at 556 (emphasis in original; citation, internal quotation marks, and brackets omitted).

Of course, not all objectively intolerable working conditions are actionable. That is because the discharge must also be "wrongful"—that is, the plaintiff must have been forced to leave for a "socially undesirable motive," such as "for exercising a job-related right" or, as plaintiff asserts here, "for fulfilling some important public duty." In other words, the working conditions cannot simply be intolerable in the abstract; for example, although the fact that a public official lies to his employees or to the public may be objectively intolerable to a reasonable person and cause such a person to resign from employment, that is not sufficient to establish a wrongful discharge; rather, the intolerable conditions must be created *as the result of* the employee's fulfillment of—or attempt to fulfill—an important public duty.

Plaintiff has failed to meet that test here. He relies on the "fundamental principle of open, honest government" as the source of what he contends is "an important public duty and societal obligation to treat the Mayor's office as a public trust," pointing to the writings of Thomas Jefferson and United States Supreme Court Justice Byron White, as well as ORS 244.010(1) and certain provisions of the city's Code of Ethics. Even setting aside the question whether those sources are sufficient to give rise to the "important public duty" that plaintiff asserts, plaintiff has, in any event, failed to establish that the city created objectively intolerable working conditions, resulting in plaintiff's forced resignation, *because of* plaintiff's fulfillment of the asserted public duty. *See Handam*, 225 Or App at 452 (plaintiff must present evidence from which a jury could find a motive by defendant to discharge plaintiff for carrying out an important societal obligation). Rather, he asserts that he was constructively wrongfully discharged in *anticipation* of carrying out what he asserts is an important societal obligation. That is insufficient to establish a public duty wrongful-discharge claim.

Framed in accordance with the legal standards for establishing a wrongful *constructive* discharge, plaintiff's theory, as we understand it, is that the "deception and [] seemingly endless series of lies" in the mayor's office created

working conditions that were so intolerable, given plaintiff's position as communications director, that he was forced to quit (as would any reasonable person) in order to fulfill the important public duty to protect the public trust by not participating in Adams's continued misrepresentations to the public. Significantly, his complaint alleges:

> "In view of [plaintiff's] *** reputation for truthfulness and Adams'[s] persistent pattern of engaging in public misrepresentations, defendant *** knew that [plaintiff] was substantially certain to leave his employment as a result of working conditions in the Mayor's office in which making untrue statements to the public on Adams['s] behalf was required on a regular basis."

The problem with plaintiff's argument is that he failed to present evidence to support that theory. That is, plaintiff failed to present evidence from which a jury could find that the identified "intolerable" conditions of employment leading to his wrongful discharge existed.

Bluntly, plaintiff's evidence does not support his assertion that regularly making untrue statements to the public was required of him. Although the evidence establishes that plaintiff may have twice been told things about the mayor's relationship with Breedlove that turned out to be untrue, there is no evidence that plaintiff was asked to provide that false information to the public. Plaintiff also suggests that there is evidence that Miller used him to pass along to the public false information that the mayor was "at home conducting City business, meeting with people in the community" during the three days immediately after the story about Breedlove broke. However, the undisputed evidence in the record shows that, during the period in question, Adams met with several of his staff members as well as members of the community at his home. Similarly, plaintiff testified that he was told to respond to reporters' requests for Adams's schedule that the schedule was "not available," when he knew that one existed. However, that evidence also is insufficient to support an inference that plaintiff was required to lie to the public—plaintiff was not told to tell the media that a schedule did not exist, only that one was "not

available" to them, as Miller had apparently decided not to make it available to the media.[4]

Nor is there evidence that the city ever took any action against plaintiff for *not* lying to the public. The only evidence that even comes close is plaintiff's testimony that Miller once told a staff member to keep certain information from plaintiff in the future after plaintiff was "criticized" for releasing similar information to the public. We can envision a scenario in which the city could create an intolerable working environment by so restricting plaintiff's access to the mayor or to other information needed to fulfill the role of communications director such that a juror could properly infer that it was done intentionally as a result of plaintiff's "refusal" to go along with misrepresentations to the public. That, however, is not the scenario presented here.

In that respect, *Lamson* provides some parallels. In *Lamson*, the plaintiff, a sales manager for a car dealership, was terminated from his employment after he had failed to participate in a sales event conducted by an outside sales firm, RPM, that, in his view, used sales tactics that were unethical and illegal, and had complained about those practices to management. 346 Or at 630-33. The plaintiff then filed an action for wrongful discharge, alleging that his refusal to participate in the sales event and his reports to management about RPM's tactics "fulfilled an important public purpose"—specifically, "'attempting to stop the unethical and unlawful trade practices [that] RPM was utilizing'" and "'refusing to aid RPM in committing unlawful trade practices in violation of Oregon law.'" *Id.* at 633. He pointed to ORS 646.608, which identifies unlawful business and trade practices, and accompanying regulations, arguing that those sources "reflect a strong public interest in preventing the kinds of sales tactics that purportedly were used during the RPM sales event." 346 Or at 638. The jury returned a verdict in the plaintiff's favor, and the defendant appealed the resulting judgment.

---

[4] To the extent plaintiff contends that Miller used him to give false information to a *Time* magazine reporter about whether Adams was in his office on a particular day, regardless of whether that information was true, the incident occurred after plaintiff had made the decision to resign. Therefore, it cannot have contributed to the conditions that forced plaintiff to resign.

The Supreme Court ultimately reversed. Although the court agreed with the plaintiff that the laws that he had identified "reflect a public policy that generally prohibits and seeks to prevent the kinds of deceptive conduct" about which the plaintiff was concerned, *id.*, it concluded that the plaintiff's specific theories of wrongful discharge did not relate to that policy. As relevant here, it explained:

"Plaintiff first contends that he was wrongfully discharged for refusing to engage in unlawful and unethical practices. The public policy we have discussed might be thwarted by such a discharge, and, *if the evidence presented at trial supported plaintiff's claim that he was fired for refusing a directive to violate state law, a wrongful discharge claim might lie. But the evidence does not support plaintiff's contention.* In fact, plaintiff acknowledged in his own testimony that his superiors never asked him to do anything unlawful or unethical."

*Id.* at 638-39 (emphasis added).

Here, too, plaintiff, as he acknowledged in his deposition testimony, never gave false information to the public about the Breedlove matter, nor was he asked to do so. In sum, even assuming that a public duty wrongful-discharge claim could arise in these circumstances from the sources that plaintiff identifies, the evidence on which plaintiff relies is insufficient as a matter of law to support his theory that the conditions in the mayor's office had become so intolerable as a result of plaintiff's *refusal to lie to the public as required* that a reasonable person would be forced to resign. Said differently, plaintiff has failed to present evidence from which a jury could find that he was discharged *because of* his refusal to breach the public duty that he identifies.

Plaintiff argues that our opinion in *Love v. Polk County Fire District*, 209 Or App 474, 149 P3d 199 (2006), supports his position. We disagree. In *Love,* the plaintiff alleged that she was wrongfully discharged for expressing complaints about deficiencies in the defendant's safety training and her belief that the defendant was perpetrating a "cover-up" in response to an investigation by the National Institute for Occupational Safety and Health (NIOSH). *Id.* at 480. We held that the plaintiff had raised genuine issues

of material fact about whether she had been discharged for threatened "whistleblowing" about the defendant's possible cover-up in response to the NIOSH investigation. *Id.* at 494. In so concluding, we held that the public interest advanced by whistleblowing in that context was substantial and that the plaintiff had adduced evidence—sufficient to defeat summary judgment—of the plaintiff's objectively reasonable belief that the defendant was engaging in such a cover-up and *that the plaintiff's discharge was motivated, at least in part, by her threat to report the cover-up. Id.* at 495-96. Similarly, in *Huber v. Dept. of Education,* 235 Or App 230, 243-44, 230 P3d 937 (2010), on which plaintiff also relies, we reversed the trial court's grant of summary judgment to the employer, concluding that the employee had raised a genuine issue of material fact as to her allegation that she had been wrongfully discharged for fulfilling an important public duty by threatening to complain to the Oregon State Board of Nursing about the employer's substandard nursing practices.

In contrast, plaintiff here never threatened to tell *anyone,* let alone an entity with authority to take action, *see Lamson,* 346 Or at 640, that Adams was withholding information or deceiving the public; nor did he take any other "whistleblower" type actions. As we observed in *Love,* "general public concern over a particular social problem * * * does not necessarily give rise to a protected 'important public duty' to act, regardless of how ostensibly laudable the actor's efforts may be." *Love,* 209 Or App at 487. The trial court did not err in granting summary judgment for the city on plaintiff's wrongful-discharge claim.

B. *Wage Claim*

In his second assignment of error, plaintiff challenges the trial court's grant of summary judgment on his wage claim under ORS chapter 652. ORS 652.140[5] requires

---

[5] ORS 652.140 provides, as relevant:

"(1) When an employer discharges an employee or when employment is terminated by mutual agreement, all wages earned and unpaid at the time of the discharge or termination become due and payable not later than the end of the first business day after the discharge or termination.

"(2)(a) When an employee who does not have a contract for a definite period quits employment, all wages earned and unpaid at the time of quitting become due and payable immediately if the employee has given to the

employers to pay all wages immediately after an employee is terminated or, if adequate notice is given, when an employee quits. If an employer fails to pay the wages required by ORS 652.140, then penalties apply under ORS 652.150,[6] and the employee may seek attorney fees under ORS 652.200. There is no directly applicable statutory definition of "employ" or "employee" for purposes of ORS 652.140, ORS 652.150, and ORS 652.200.

In this case, plaintiff pleaded that (1) he was not paid wages for November and December 2008, in violation of ORS 652.140; (2) his "regular" rate of compensation was $6,250 per month; (3) under ORS 652.150, "the penalty for nonpayment of wages includes the continuation of the compensation for eight hours per day until paid (subject to a 30[-]day maximum penalty)"; and (4) therefore, "[b]y reason of the City's failure to pay wages when due," he is entitled to not less than $18,750, consisting of wages for November and December 2008, plus penalty wages.[7] Thus, plaintiff's premise is that, notwithstanding the parties' agreement that plaintiff's position would not begin until January 2009, at which time he would be paid $6,250 per month, he was, nonetheless, an employee entitled to be paid for the work that he did in November and December 2008 at the salary that plaintiff and the city had agreed that plaintiff would be

employer not less than 48 hours' notice, excluding Saturdays, Sundays and holidays, of intention to quit employment.

"(b) Except as provided in paragraph (c) of this subsection, if the employee has not given to the employer the notice described in paragraph (a) of this subsection, the wages become due and payable within five days, excluding Saturdays, Sundays and holidays, after the employee has quit, or at the next regularly scheduled payday after the employee has quit, whichever event first occurs."

[6] ORS 652.150 provides, as relevant:

"(1) Except as provided in subsections (2) and (3) of this section, if an employer willfully fails to pay any wages or compensation of any employee whose employment ceases, as provided in ORS 652.140 and 652.145, then, as a penalty for the nonpayment, the wages or compensation of the employee shall continue from the due date thereof at the same hourly rate for eight hours per day until paid or until action therefor is commenced. However:

"(a) In no case shall the penalty wages or compensation continue for more than 30 days from the due date[.]"

ORS 652.150 was amended in 2011. Or Laws 2011, ch 348, § 2. Those amendments have no bearing on our analysis in this case.

[7] Plaintiff also sought attorney fees under ORS 652.200.

paid beginning in January 2009. That theory is untenable for several reasons.

The trial court concluded that the record established that plaintiff was not "employed" by defendant during November and December 2008 due to the operation of *ORS 653.010(2)*—which, as noted, excludes from the meaning of "employ," for purposes of Oregon's minimum-wage law, "voluntary or donated services performed for no compensation or without expectation or contemplation of compensation as the adequate consideration for the services performed for a public employer"—and, therefore, plaintiff was not entitled to wages for those months.

On appeal, plaintiff fails to address the basis for the trial court's decision. Rather he argues, as he did below, that he was not a "volunteer" under a proper interpretation of the term "employee" under *ORS 657.015*, which provides:

> "*As used in this chapter* * * *, 'employee' means any person * * *, employed for remuneration or under any contract of hire, written or oral, express or implied, by an employer subject to this chapter in an employment subject to this chapter. *'Employee' does not include a person who volunteers or donates services performed for no remuneration or without expectation or contemplation of remuneration as the adequate consideration for the services performed for a religious or charitable institution or a governmental entity.*"

(Emphasis added.) He offers a cursory argument that, on this record, he could not be considered a volunteer under *that statute* because he was "coerced" to work without pay in November and December of 2008 in order to get his job with the city, pointing to a federal regulation interpreting 29 USC section 203(e)(4)(A), which, he contends, is the federal "counterpart" to ORS 657.015. According to plaintiff, under the applicable federal regulation, 29 CFR section 553.101(c), "an employee cannot be considered a 'volunteer' where the employee is subject to an employer's direct or indirect pressure or coercion."

There are multiple problems with that argument. First, plaintiff does not explain—and we do not readily discern—how the definition of employee in *ORS 657.015* governs plaintiff's wage claim under ORS 652.140 and

ORS 652.150. The definition of "employee" in ORS 657.015 applies, by its terms, only to ORS chapter 657, which sets forth Oregon's unemployment insurance and compensation scheme. Plaintiff offers no theory as to why the policies that bear on that scheme should be understood to extend to wage claims. Absent some basis to link that framework to plaintiff's claim under ORS chapter 652, and we can discern none, ORS 657.015 has no bearing on plaintiff's claim.

Moreover, it is unclear that the federal law on which he relies—29 USC section 203(e)(4)(A) and 29 CFR section 553.101(c)—is indeed a "counterpart" of ORS 657.015. *Those* provisions govern the *minimum-wage provisions* of the federal Fair Labor Standards Act (FLSA), not unemployment insurance and benefits. And, even setting aside that discrepancy, he offers no legislative history or other context indicating that the Oregon legislature, in enacting ORS 657.015, intended to adopt the federal understanding of the term "employee" that is encompassed in those federal provisions. He contends only that "[f]ederal regulations and case law are persuasive authority when considering whether an employment relationship exists for purposes of Chapter 652 and 653 of the Oregon Revised Statutes," relying on *Northwest Advancement v. Bureau of Labor*, 96 Or App 133, 772 P2d 943, *rev den*, 308 Or 315 (1989), *cert den*, 495 US 932 (1990). However, in *Northwest Advancement*, we held that, because most of ORS *chapter 653* (Oregon's minimum-wage law) is patterned after the FLSA, federal regulations and case law are "instructive" in interpreting *that* chapter. *Id.* at 136-37.[8] It says nothing about ORS chapter 652 and whether its provisions also were modeled after provisions of the FLSA, such that FLSA regulations and case law would be equally persuasive in interpreting the meaning of "employee" for purposes of a claim under ORS 652.140 and 652.150. *Cf. Cejas Commercial Interiors, Inc. v. Torres-Lizama*, 260 Or App 87, 97-99, 316 P3d 389 (2013)

---

[8] Plaintiff also cites *Nash v. Resources, Inc.*, 982 F Supp 1427 (D Or 1997), for that proposition. Of course, a federal district court opinion is not binding precedent in this court; moreover, *Nash* itself cites *Northwest Advancement* as authority for its observation that "[f]ederal regulations and case law are persuasive authority when considering whether an employment relationship exists for purposes of Chapters 652 and 653 of Oregon Revised Statutes." *Nash*, 982 F Supp at 1437.

(discussing legislative history of ORS 653.010(2) indicating that Oregon patterned its minimum-wage statutes in ORS chapter 653 after the FLSA and adopted the FLSA's definition of the term "employ" for the purpose of determining whether a relationship is an employment relationship under that chapter).

In short, plaintiff has given us no reason to conclude that the trial court's interpretation of the "volunteer" exception to the meaning of "employ" contained in ORS 653.010(2) is incorrect.[9] Nor has he provided any basis for us to conclude that, instead, ORS 657.015—interpreted consistently with federal law—has any bearing on whether he is an employee for purposes of his claim under ORS 652.140 and ORS 652.150. *See, e.g., Beall Transport Equipment Co. v. Southern Pacific,* 186 Or App 696, 700 n 2, 64 P3d 1193, *adh'd to as clarified on recons,* 187 Or App 472, 68 P3d 259 (2003) ("[I]t is not this court's function to speculate as to what a party's argument might be. Nor is it our proper function to make or develop a party's argument when that party has not endeavored to do so itself."). In other words, plaintiff has not established the existence of a triable issue of fact on whether he was an "employee" in November and December 2008 for purposes of his wage claim under the latter statutes.

We mention one additional problem with plaintiff's claim. Even if it could somehow be said that plaintiff was an employee of the city for purposes of ORS 652.140, and, therefore, entitled to some measure of wages under ORS 652.140

---

[9] We note that the applicability of ORS 653.010 in this context is, in our view, far from apparent. *See Lamy v. Jack Jarvis & Company, Inc.,* 281 Or 307, 312-13, 574 P2d 1107 (1978) (noting inability to find applicable statutory definition of "employee" for purposes of ORS 652.140, ORS 652.150, and ORS 652.200(2) and using definitions of "employee" in ORS 652.210(2) and ORS 652.310(2), neither of which, strictly speaking, apply in an action for unpaid wages, to determine whether the plaintiff was an employee or a co-partner); *see also* ORS 652.310(2) (defining "employee" for purposes of ORS 652.310 to 652.414, which authorizes Bureau of Labor and Industries to enforce wage claims on behalf of employees); *Taylor v. Werner Enterprises, Inc.,* 329 Or 461, 467, 988 P2d 384 (1999) (concluding that definition of "employer" in ORS 652.310(1) applies to ORS 652.150); *Wyatt v. Body Imaging, P.C.,* 163 Or App 526, 530, 989 P2d 36 (1999), *rev den,* 330 Or 252 (2000) (interpreting meaning of term "wages" in ORS 652.140 by reference to its common meaning, noting that the term is not defined for purposes of that statute).

and ORS 652.150 for November and December 2008, as he claims, he fails to explain why those wages would be calculated at the rate of $6,250 per month. The undisputed evidence is that plaintiff and the city agreed that plaintiff would be paid that amount beginning in January 2009, when Adams took office and plaintiff began working as Adams's *communications director*. Plaintiff identifies no legal principle under which he would be entitled to wages calculated on that basis for work performed by him *before* that date, *viz.*, *before* plaintiff began working as communications director. *Cf. Wells v. Carlson*, 78 Or App 536, 539-41, 717 P2d 640 (1986) (timber faller, who brought action to recover wages and statutory penalties under ORS 652.150 when logging company terminated his employment, was an "employee" not an independent contractor, and there was sufficient evidence to support his claim in *quantum meruit* for wages based on the rate paid to another timber cutter).

In sum, plaintiff has provided no basis for us to overturn the trial court's ruling on his wage claim.

### III. CONCLUSION

Plaintiff has failed to establish that the trial court erred in granting summary judgment to the city on his claims for wrongful discharge and unpaid wages. Accordingly, we affirm.

Affirmed.