Argued and submitted April 13, 2018; affirmed on appeal, on cross-appeal, judgment for plaintiff reversed September 18, 2019

Kyle K. WALKER,
*Plaintiff-Appellant,*
*Cross-Respondent,*

*v.*

STATE OF OREGON,
by and through
the Semi-Independent State Agency,
the Oregon Travel Information Council,
branded and doing business as
the Oregon Travel Experience,
*Defendant-Respondent,*
*Cross-Appellant.*

Marion County Circuit Court
15CV02202; A163420

450 P3d 19

Plaintiff appeals a judgment of the trial court rejecting her statutory whistle-blowing claim under ORS 659A.203. The State of Oregon cross-appeals, assigning error to the trial court's denial of its motion for directed verdict on plaintiff's common-law wrongful-discharge claim. *Held*: The trial court erred in denying the state's motion for directed verdict on plaintiff's common-law wrongful-discharge claim because there was no evidence from which a jury could find that plaintiff had been discharged for fulfilling an important public duty. In light of that disposition, which requires reversal of the judgment for plaintiff on her common-law wrongful-discharge claim, the Court of Appeals rejected plaintiff's appeal concerning her statutory whistleblowing claim, which was dependent in part on the judgment for plaintiff on the wrongful-discharge claim.

Affirmed on appeal; on cross-appeal, judgment for plaintiff reversed.

Mary Mertens James, Judge.

Luke W. Reese argued the cause for appellant-cross-respondent. Also on the briefs was Garrett Hemann Robertson PC.

Denise G. Fjordbeck, Assistant Attorney General, argued the cause for respondent-cross-appellant. Also on the briefs were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Armstrong, Presiding Judge, and Tookey, Judge, and Shorr, Judge.

ARMSTRONG, P. J.

Affirmed on appeal; on cross-appeal, judgment for plaintiff reversed.

**ARMSTRONG, P. J.**

Plaintiff Kyle Walker brought claims against defendant Oregon Travel Information Council (the Council), a semi-independent agency of the State of Oregon, for common-law wrongful discharge and statutory "whistleblowing," ORS 659A.203,[1] arising out of her discharge from a position as the Council's director. The trial court allowed plaintiff's wrongful-discharge claim to be submitted to the jury, which awarded plaintiff damages of $1.2 million. However, the court rejected plaintiff's claim for statutory whistleblowing, which was tried to the court. Plaintiff appeals, assigning error to the trial court's rejection of the statutory claim. The Council cross-appeals, contending that the trial court erred in allowing the common-law wrongful-discharge claim to go to the jury. We conclude that the trial court did not err in rejecting plaintiff's statutory claim, but we agree with the Council on its cross-appeal that the trial court erred in submitting the wrongful-discharge claim to the jury. We therefore reverse the judgment.

The Council, together with the Department of Transportation, is responsible for the placement and permitting of tourist-oriented signs along state highways. The Council also manages, maintains, improves, and develops a number of rest areas around the state that are owned by the Department of Transportation and the Department of State Parks and Recreation. ORS 377.805; ORS 377.841. The Council receives its funding from sign-permit fees and the State Highway Fund, as allocated to the Council by the Department of Transportation. ORS 377.841(6).

---

[1] ORS 659A.203(1) provides, in part:

"Subject to ORS 659A.206, except as provided in ORS 659A.200 to 659A.224, it is an unlawful employment practice for any public or nonprofit employer to:

"* * * * *

"(b) Prohibit any employee from disclosing, or take or threaten to take disciplinary action against an employee for the disclosure of any information that the employee reasonably believes is evidence of:

"(A) A violation of any federal, state or local law, rule or regulation by the public or nonprofit employer;

"(B) Mismanagement, gross waste of funds or abuse of authority or substantial and specific danger to public health and safety resulting from action of the public or nonprofit employer[.]"

The Council consists of 11 volunteer members, including the chairperson of the Oregon Transportation Commission (or designee) and 10 members appointed by the Governor from the public at large. ORS 377.835(2) (2013).[2] The Council's bylaws state that a quorum of six members is required to transact business. The Council elects officers (a chair, vice-chair, and secretary) and is supported by a staff of paid employees, including a director, who serves at the Council's pleasure and is charged with "administrative control" of the Council. ORS 377.835(7).

The Council is a "semi-independent" agency. ORS 377.835. It is permitted to develop its own personnel rules and salary-classification system.[3] The Council is required to adopt a biennial budget, ORS 291.206(1) (relating to rules guiding state agencies in preparation of budget requests), but the budget is not subject to review or approval by the legislature or to future modification by the Emergency Board or the legislature, and is exempt from state spending limitations. ORS 377.840(6). However, the Council must file an annual report with the Governor, the legislature, and the Legislative Fiscal Officer, ORS 377.838, and the Council's finances are subject to annual review by the Secretary of State. ORS 377.840(7).

The Council staff is led by the director. At the relevant time, ORS 377.835(7) (2013) provided:

"The Council shall be under the administrative control of a director who is appointed by and who holds office at the pleasure of the Council. The director of the Council may appoint all subordinate officers and employees of the Council and may prescribe their duties and fix their compensation. The director of the Council may delegate to any subordinate officer or employee any administrative duty,

---

[2] References to ORS 377.835 are to the 2013 version of the statute, in effect at the relevant time.

[3] As a semi-independent agency, the Council is exempt from the state personnel system, ORS 377.836(1); state financial administration, including the legislative budgeting process, ORS chapter 291; the state salary and payroll system, ORS chapter 292; and ORS chapter 293, relating to the administration of public funds. ORS 377.836.

function or power imposed upon the Council by or pursuant to law."[4]

Under its bylaws, the volunteer Council is the governing body for the agency and is responsible for establishing its budget. The bylaws state that the Council has exclusive authority to determine the employment status and compensation of the director, who serves at the pleasure of the Council. The director, in turn, has the authority to appoint all subordinate officers and employees and may prescribe their duties and compensation, within the Council's salary guidelines. The director may contract with state agencies but may not, without prior approval of the Council, authorize an expenditure of funds in excess of $25,000. ORS 377.838.

Under the Council's bylaws, the executive committee consists of three elected officers and one other member of the Council. The executive committee is charged with serving as a resource to the director and staff on all matters that relate to the administration of the organization and making recommendations to the Council. The executive committee is also required to conduct an annual evaluation of the director. Under the bylaws, the finance committee consists of one executive committee member and a minimum of two other council members and is charged with coordinating with staff to review planned budgets and financial reporting.

Because it is largely dispositive of the issues raised on appeal, we first address the Council's contention raised on cross-appeal that the trial court erred in allowing plaintiff's wrongful-discharge claim to be submitted to the jury. We summarize the undisputed facts from the record.

The Council hired plaintiff as the Council's director in December 2012. The offer of employment stated:

---

[4] In 2017, the legislature amended ORS 377.835(7). Or Laws 2017, ch 105, § 1. The statute now provides that the Council is required to hire an executive director and to "define the duties of and fix the salary of an executive director." ORS 377.835(7). The executive director, in turn, has the authority "to direct the affairs of the agency," subject to the direction of the Council. *Id.* The statute also gives the executive director the authority to appoint all subordinate officers and employees of the agency, to prescribe their duties, to provide supervision, and to fix their salaries. *Id.*

"Beginning on December 10, 2012, you will serve as the CEO/Executive Director of Oregon Travel Experience. Pursuant to ORS 182.468, this position is an unclassified executive service position in which you serve at the pleasure of the Oregon Information Council in an 'at will' status, with no property interest to this position.

"This is an appointment to a semi-independent agency. Your gross salary will be paid monthly at $9,585.33 per month ($115,000 annually). Benefits include three weeks paid vacation, accrued upon execution of this letter for the first year; vacation will accrue monthly in subsequent years. You will also receive a comprehensive package of state benefits, including full coverage health insurance for you and your family for medical, dental and vision paid by the agency, excepting adjustable fees that are dependent on your responses to the PEBB annual [renewal] questionnaire. PEBB requires employees to contribute 5% toward the cost of health and dental coverage.

"The executive committee will conduct a performance review six months after hire; any compensation adjustments will be made at the first anniversary of your hire."

An audit by the Secretary of State the previous year had directed the Council to develop an employee classification and salary structure, and plaintiff hired a human resources director to begin that process. As a semi-independent agency, the Council was exempt from the personnel policies of the State of Oregon. The Council expressed to plaintiff its concern that the current salary structure was "top heavy" and its desire to stay within its existing budget. The Council chair told plaintiff that, although the Department of Administrative Services (DAS) "Hay"[5] system could be a resource for the employee handbook and for mapping out positions and salary ranges, salaries should be kept within the budget that had been adopted by the Council, with plaintiff's salary at the top. Almost immediately, conflicts arose between plaintiff and the Council's executive committee over the salary structure.

Plaintiff recognized that her own salary would be the "keystone" for the Council's personnel compensation plan.

---

[5] The "Hay" system is an evaluation method used by public and private entities to map out and structure job roles within their organizational structure.

At her six-month review in June 2013, plaintiff presented the Council with an analysis comparing her salary to that of directors of other semi-independent agencies. Plaintiff requested that, beginning on plaintiff's one-year service date, the Council establish a director salary aligned with a DAS management salary range 7-PEMH of $9,955 per month. Plaintiff also requested a 5 percent ($2,875) retroactive raise to compensate her for human resources work that she had assumed during her first six months of employment before the hiring of a human resources director.

Plaintiff also sought an increase in her sick-leave benefit. Because she had had only 8.5 days of sick leave available during the first few months of employment, plaintiff stated that she had been required to use vacation time for treatment related to an on-the-job injury. She requested an additional sick-leave "bank" of 40 hours to offset the loss of vacation time and for an anticipated medical procedure before the end of the year.

The Council did not approve the additional retroactive pay and told plaintiff that an adjustment to her salary would be considered as a part of her year-end review. In its review of plaintiff's performance, the Council's executive committee expressed concern over plaintiff's resistance to the executive committee's "changes in process," her level of communication with the Council and the executive committee, her attempts to "over-manage" the executive committee, and her "over-focus on total compensation (salary and benefits)." The Council extended plaintiff's probationary period for an additional six months.

On June 30, 2013, the Council adopted its proposed budget for the 2013-2015 biennium. The budget included a 1.5 percent cost-of-living increase for employees. The Council directed plaintiff to present a salary structure to the Council that was within the Council's existing budget and to seek Council approval for any classification or pay decisions that affected the budget. Plaintiff agreed to come back to the Council before implementing a new salary structure.

Plaintiff and the human resources director continued to analyze employee positions, including plaintiff's position,

under the Hay classification system used by DAS and to develop a compensation plan that aligned with DAS salaries. The plan, which the human resources director shared with the Council in December 2013, classified plaintiff's position as a "Principal Executive Manager H," with a salary range of $98,148 to $140,364, and a recommended salary for plaintiff of $127,364.

In addition to a salary increase of $12,000 for plaintiff, the plan included pay raises for those employees who had had performance reviews in the past six months, with an annual budgetary effect of $48,000. Because plaintiff believed that it was her responsibility to set salaries of employees and that the financial effect of the new salary scale was minimal, plaintiff implemented the new salary structure on January 1, 2014, without the Council's or the finance committee's approval, and the Council did not learn that the new salary scale had been implemented until February 19, 2014.

At its January 2014 meeting, the Council ended plaintiff's probationary period and announced that plaintiff's salary would be increased by $5,000 from $115,000 to $120,000. Because the Council had not approved the raise that plaintiff had requested for herself, plaintiff asked the Council chair to sign an "exception form" describing its reasons for paying plaintiff less than the proposed salary scale. The Council chair declined, explaining that plaintiff's salary was within the range provided to plaintiff when the Council hired her.

At the end of January 2014, the Council chair and vice-chair met with plaintiff to discuss concerns about her continued efforts to increase her salary. At that time, plaintiff told them that the new compensation plan had been completed and was "ready to go," but she did not tell them that it had already been implemented. The vice-chair requested information about the salary scale. After checking with Department of Justice, plaintiff sent the vice-chair the previous pay scale *before* the changes that had gone into effect.

In February 2014, the Council asked plaintiff to hold off on any agency restructuring to allow the Council to

approve a strategic plan for the agency, which could affect the organizational chart and staffing. Plaintiff believed that this was an infringement on her authority as director. She met with Michael Jordan, the director of DAS, "because I started getting a little bit concerned about some of these authority pieces and was looking for some help." Plaintiff understood that DAS could advise boards and commissions through training and could mediate conflicts and resolve issues. Jordan told plaintiff that, due to budgetary constraints, he was unable to offer any assistance in training, and he suggested that the Governor's office might be willing to intervene.

On February 19, the Council chair learned for the first time that the new salary plan had been implemented effective January 1. The Council chair asked plaintiff to meet with the executive committee on March 12, 2014, to discuss "several issues, including the areas of compensation and salary ranges." Plaintiff offered to bring support staff to the meeting, but the Council chair told her that would not be necessary.

The council had not previously published notice of its executive committee meetings. The Council's bylaws state that six members constitute a quorum, and the executive committee consists of only four members. However, because there were vacancies on the Council, plaintiff wondered whether an executive committee meeting might constitute a quorum and therefore a "public meeting" under the Public Meetings Law, ORS 192.610 to 192.695. Plaintiff's executive assistant told her that notice would be required. Plaintiff asked the executive assistant to check with the Department of Justice, and an attorney advised that the meeting needed to be noticed, because the executive committee was the Council's governing body and its meetings were therefore required to be public. *See* ORS 192.630(1) ("All meetings of the governing body of a public body shall be open to the public.").

Plaintiff testified that she then asked her executive assistant to ask the Council chair whether the meeting should be noticed, and that the Council chair told the executive assistant that notice would not be necessary, because

the executive committee did not constitute a quorum of the Council. Plaintiff testified that she knew that, as director, it was her responsibility to see that public meetings were noticed, and that she would not have expected members of the executive committee to know whether a notice was required. She did not personally tell the Council chair that notice was required but believed that her executive assistant had told the Council chair that an attorney from the Department of Justice had advised that notice of the meeting needed to be given.[6] She testified that she did not send notice of the meeting.

Plaintiff testified that she knew, going into the March 12, 2014, executive committee session, that it would be in violation of the Public Meetings Law, because no notice had been given. She nonetheless did not correct the Council chair's view that notice was not required, because she was aware that she served at the pleasure of the Council. Plaintiff anticipated that she might be fired at the meeting.

Plaintiff was not fired at the meeting, and the executive committee did not take any formal action. Rather, plaintiff testified that there was a conversation about the executive committee's disappointment relating to plaintiff's handling of the salary issue. Although the Council did not cancel the raises that plaintiff had implemented in January

---

[6] Plaintiff testified that, after receiving advice from the Department of Justice,

"[w]e took the information we had and queried [the Council chair] and said, 'You know what? We think this meeting needs to be noticed because of the quorum issues.' *** And we gave [the Council chair] all that information and she said, 'No. It's not necessary. We'll proceed.'"

On cross-examination, defense counsel asked plaintiff whether her executive assistant had sent an email notifying the Council chair that notice of the meeting needed to be given. She testified:

"I'm saying that's a possibility. You'll have to ask [the executive assistant]."

The executive assistant was asked by plaintiff's counsel if she had any recollection of plaintiff talking about how the notice issue would be communicated to the executive committee members, and she did not recall. She testified:

"I don't know that there would be reason to communicate with them if it was *** a meeting that needed to be publicly *** noticed, it would not be up to them and I would have just done it if that was the direction I was given."

And again:

"If it needed to be publicly noticed it needs to be publicly noticed. They didn't need to be notified that it needed to be publicly noticed."

without notifying the Council, the Council gave plaintiff specific direction for the creation of the agency's salary structure.[7] Plaintiff believed once again that the Council was micromanaging her and treading on her statutory responsibilities as administrator.

After the March 2014 meeting, the Council chair became aware that the meeting had been held in violation of the Public Meetings Law, initiated a training for staff, and required that all future meetings of the executive committee be subject to notice. Staff was notified that notice of future meetings of the executive committee had to be given. The executive committee gave notice of its April 3, 2014, meeting and has given notice for all subsequent meetings.

On April 1, 2014, the Council's management team, including plaintiff, brought on Wyland as a policy analyst. Wyland was the long-time domestic partner of plaintiff's brother and was regarded by plaintiff as her sister-in-law. Plaintiff told the management team that she and Wyland were acquainted, but she did not reveal the nature of the acquaintance. Despite recommendations of the Council that new management be hired at the middle of the pay scale, plaintiff brought Wyland on at the top of the pay scale.

Plaintiff's chief operating officer joined plaintiff at the Council meeting of April 3, 2014, to explain the fiscal effect of the new pay scale. The draft salary chart that plaintiff presented to the Council continued to list salaries in relation to a salary of $127,000 for herself, which plaintiff had proposed but the Council had not approved. One Council member stated that it was his impression that the DAS model would not be the basis for salaries and that the keystone would be the salary range that the Council had established for plaintiff. Council members also expressed concern that the proposed salary structure continued to be top heavy.

After the April 3, 2014, Council meeting, plaintiff believed that the Council was intent on micromanaging her and exceeding its legal authority. On April 8, 2014, plaintiff

---

[7] For example, the Council told plaintiff that the salary structure should assume cost-of-living increases but not automatic step increases.

and her leadership team sent Jordan a memorandum "as follow up to conversations regarding emerging *** Council governance issues," listing their concerns:

"1.   The Chair/Vice Chair now claim they directed the CEO to <u>not</u> align with DAS best practices. This is contrary to agency guidance shared by you with my predecessor and board member Russell dating back to 2012, and in response to subsequent 2012 and 2013 Secretary of State Audits.

"2.   There was no process established regarding the CEO annual performance review and compensation adjustment, no collaborative venue to set goals, discuss progress or share Council expectation. The Executive Committee does not recognize the position classification nor salary range resulting from the agency Classification and Salary study.

"3.   The Chair has declined any suggestion to invest time to improve governance practices either through a retreat, work session or board training event.

"4.   The Executive Committee and Vice Chair in particular, are eliminating a Roles and Authority document established early last year which outlines duties of the Policy body and the CEO.

"5.   The Chair, without approval of the Council, introduced and got passed legislation that changed the quorum requirement anticipating a reduction in the number of Council members from 11 to 9 to be introduced in 2015. This has been problematic for Council meetings and set up the Executive Committee as a majority voting block on the Council.

"6.   The Executive Committee is currently out of compliance with current Council operating procedures, and statute regarding roles and authorities.

"7.   The Chair has delayed updating the Council Operating Procedures since May of 2012.

"8.   The Chair and Executive Committee are not involving the Council at large in making agency decisions and are directing staff on administrative matters.

"9.   There remains a question of potential conflict of interest and at a minimum perceived issue of fairness of the Chair and Vice Chair based on their professions as lobbyists for transportation clients and the Vice Chairs

involvement in a lawsuit against the state with regard to the DAS portal fee.

"10.  We have not been operating with a full Council. The Chair has determined and shared with Council the intent to reduce the number of members on the board which will be addressed in the 2015 Legislative session by holding off of on [*sic*] filling vacancies. This has resulted in the Executive Committee having a majority of votes on key matters.

"11.  The Chair and Executive Committee have violated public meeting law.

"12.  The Executive Committee are attempting to micromanage agency operations under the guise of 'broad direction' without Council authority directing how the salary structure should be changed and how employees will be rated on performance evaluations without regard to the Classification and Salary study. They do not recognize the authority of the CEO per statute regarding these matters.

"13.  The Chair and Executive Committee are giving direction to the CEO and Executive Administrative Leadership with shifting demands resulting in having to set aside important work on daily operational matters, framing an Amended Budget, completing the Strategic Plan document and preparing a packet for the May 20th Council meeting.

"Over the past three weeks this has escalated to the point that intervention is needed to prevent the agency from moving further into conflict, to reduce organizational risk and to mitigate the potential for unnecessary public exposure or employee litigation. [redacted sentence]

"I am deeply saddened by the situation. As an elected [*sic*] official and representative of the public trust, my ethics and background in public governance prevent me from being a party to or condoning to these actions. I am unwilling to support the direction of the Executive Committee without the involvement of the entire Council, their willingness to adhere to statute and public meeting law, and operate in a transparent and accountable manner."

Plaintiff did not send a copy of her memorandum to the Council.

At the May 20, 2014, meeting of the Council, the executive committee recommended and the Council approved

changes to the Council's procedures that clarified the Council's supervision of the budget and agency policy. Plaintiff presented the Council chair with a report delineating her own view of the respective roles of the Council and the director. The Council chair did not react favorably to that report, and the executive committee declined to present it to the Council for a vote.

The Council's September 2014 meeting was uneventful. The Council adopted a strategic plan. After that meeting, the Council chair requested a meeting with plaintiff and the full council on October 1, and plaintiff attended with her leadership team. After presentations by staff, the Council chair recited a list of concerns relating to plaintiff's performance. The list included concerns about plaintiff's relationship with the executive committee. The chair also expressed a concern about plaintiff's failure to disclose her familial relationship with Wyland. At plaintiff's request, a full Council meeting was scheduled for October 22, 2014, to allow plaintiff time to respond.

At the October 22 meeting, plaintiff made a power-point presentation responding to each of the concerns raised by the Council chair. The meeting then adjourned to executive session and, on the executive committee's recommendation, on a five to three vote, the Council terminated plaintiff's employment immediately.

Plaintiff brought this action, asserting in her common-law wrongful-discharge claim that she was fired for fulfilling an "important public duty"—opposing the Council's "illegal" conduct and advocating for the Council's adherence to governance best practices. The alleged illegal conduct was the convening of the March 2014 executive committee meeting without the required public-meeting notice and the Council's interference with plaintiff's management of the agency in violation of her statutory authority to administer the Council. Plaintiff asserted that her April 8, 2014, report to Jordan and her consultation with Department of Justice relating to the respective roles of the Council and director constituted protected "whistleblowing" under ORS 659A.203, which she contended was an important public duty. The Council presented its reasons for terminating

plaintiff's employment, which plaintiff contended were pretextual. The Council chair testified that, in April 2014, she had received a call from the Governor's office telling her that plaintiff had complained to Jordan, but that she did not inquire further as to the nature of the complaint. Based on that evidence, plaintiff asserted that she had been terminated in October for having made the report to Jordan in April.

The Council sought a directed verdict on the wrongful-discharge claim. The trial court denied the motion, and a jury found for plaintiff and awarded her damages. The Council assigns error to the trial court's denial of its motion for directed verdict. In reviewing the trial court's ruling, we consider the evidence in the light most favorable to plaintiff to determine whether there is any evidence to support the elements of the claim. *Brown v. J. C. Penney Co.*, 297 Or 695, 705, 688 P2d 811 (1984) (a jury verdict will not be set aside unless there is no evidence from which the jury could have found the facts necessary to support the verdict).

The general rule in Oregon is that, in the absence of a contract, statute, or constitutional provision to the contrary, an employee may be discharged without notice and for any reason or no reason at all. *Nkrumah v. City of Portland*, 261 Or App 365, 372, 323 P3d 453 (2014). There are, however, exceptions to the general rule. For example, an employee's discharge may be actionable when the employee is discharged for fulfilling an important public duty or societal obligation. *Babick v. Oregon Arena Corp.*, 333 Or 401, 407, 40 P3d 1059 (2002); *Delaney v. Taco Time Int'l.*, 297 Or 10, 681 P2d 114 (1984). In determining whether an employee has been discharged for fulfilling an important public duty or societal obligation, courts are to review statutes and other sources of authority to determine whether there is a "substantial public policy" that would be thwarted if the employer were allowed to discharge the employee without liability. *McManus v. Auchincloss*, 271 Or App 765, 771-72, 353 P3d 271, *rev den*, 358 Or 145 (2015). Plaintiff alleged that she was wrongfully discharged for fulfilling just such an important public duty in providing her April 8, 2014, report to Jordan.

The Supreme Court has held that the act of filing a report to authorities about certain wrongdoing by an employer can constitute the exercise of an important public duty or societal obligation that will give rise to an exception to the general rule of at-will employment. *Lamson v. Crater Lake Motors, Inc.*, 346 Or 628, 640, 216 P3d 852 (2009). In *Love v. Polk County Fire District*, 209 Or App 474, 492, 149 P3d 199 (2006), we held that ORS 659A.203(1), which prohibits disciplinary action against certain public employee whistleblowers, is a statutory source of the important public duty to report government wrongdoing that can support a common-law wrongful-discharge claim. *See also McManus*, 271 Or App at 773-74.

But not every report of employer wrongdoing by a public employee will fit within that exception as fulfilling an important public duty, and we conclude that plaintiff's report to Jordan did not. To be protected from discipline for reporting wrongdoing, the plaintiff must have had an "objectively reasonable belief" that the reported conduct violated statutory or regulatory requirements. *Love*, 209 Or App at 492. Whether plaintiff had an objectively reasonable belief is a question of law for the court. *See Miller v. Columbia County*, 282 Or App 348, 358-59, 385 P3d 1214 (2016), *rev den*, 361 Or 238 (2017) (in a civil action for false arrest and malicious prosecution, reviewing as a question of law whether the police officer had an objectively reasonable belief that the plaintiff had committed a crime). With the exception of the alleged Public Meetings Law violation and the Council's alleged noncompliance with statutory "roles and authorities," plaintiff's complaints described differences of opinion between plaintiff and the Council concerning governance and "best practices." Disagreements about governance and "best practices" that do not implicate violations of the law, however, do not fall within the public-duty exception. *See Love*, 209 Or App at 493-94 (complaints based on "holistic concerns" that were not grounded in applicable statutes or rules cannot be deemed to have furthered some important public duty).

Plaintiff"s complaint to Jordan relating to "roles and authorities" had as its source the Council's rejection of

plaintiff's proposed salary structure for the agency. The only evidence at trial was that the Council rejected plaintiff's proposed salary structure because it did not comply with the Council's direction that the salary structure be within the Council's existing budget and not top heavy, and that plaintiff's salary as approved by the Council be the top of the pay scale. Because it is undisputed that the Council, not plaintiff, had responsibility for oversight of the Council's budget, for the establishment of agency policy, and for setting plaintiff's salary, it was not objectively reasonable for plaintiff to believe that the Council's rejection of a salary structure that was not approved by the Council before it was implemented, and that was not within the existing budget or consistent with plaintiff's approved salary, was a violation of the law.

Further, although we have held that, as a statutory source for an important public duty, ORS 659A.203 *can* support a common-law wrongful-discharge claim, *Love*, 209 Or App at 492, not every report of employer wrongdoing will rise to the level of fulfilling an important public duty as an exception to the general rule of at-will employment. As we said in *Love*, the whistleblowing had to be "objectively reasonable." *Id*. Necessarily, the nature of the alleged wrongdoing and the circumstances of the reporting are relevant to whether the specific report of wrongdoing is objectively reasonable and protected because it fulfills "some substantial public duty" or "enjoys high social value." *Id*. at 486-87. For the reasons explained below, we conclude that plaintiff's report to Jordan relating to the Council's violation of the Public Meetings Law is an example of a report that does not fulfill a substantial public duty.

Plaintiff was aware that, as the agency's director, it was her responsibility to send meeting notices. She did not expect Council members to know when notices were required. She knew that the March 12 meeting needed to be noticed, but she nonetheless did not correct the Council chair's misapprehension about that and did not send notice, because, she testified, she served at the Council's pleasure. Before plaintiff's April 8 report to Jordan, the Council corrected the deficiency for future executive committee meetings, and gave notice of every subsequent executive committee meeting, including a meeting on April 3. The undisputed

evidence does not support an inference that plaintiff had an objectively reasonable belief that she would have suffered an adverse employment consequence had she advised the Council chair that notice was required for the March 12 meeting. Nor does the record support an inference of an objectively reasonable belief that the report to Jordan was necessary to bring the Council into compliance with the Public Meetings Law. Those circumstances also lead us to conclude that plaintiff's report to Jordan did not fulfill a "substantial public duty" for purposes of the wrongful-discharge claim. We conclude for those reasons that the trial court erred in denying the Council's motion for a directed verdict on plaintiff's common-law wrongful-discharge claim.

As noted, plaintiff assigns error on appeal to the trial court's failure to grant her judgment on her statutory wrongful-discharge claim, ORS 659A.203. In her first assignment, plaintiff contends that the court erred in reexamining the jury's findings on plaintiff's common-law claim. In light of our conclusion that the jury should not have been allowed to consider plaintiff's common-law claim, we reject the first assignment.

In her second assignment, plaintiff asks this court to review *de novo* the trial court's ruling on the statutory wrongful-discharge claim and to reverse the trial court's judgment dismissing the claim on that basis. We decline to do that, as this case does not present an exceptional circumstance. *See* ORAP 5.40(8)(c).

Affirmed on appeal; on cross-appeal, judgment for plaintiff reversed.